ORDERED.

**Dated:  April 03, 2019**

_____
Cynthia C. Jackson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

In re:

WILLIAM W. COLE, JR.,                                    Case No.  6:15-bk-06458-CCJ
                                                        Chapter 7

                    Debtor.
_____/


**MEMORANDUM DECISION SUSTAINING, IN PART,**
**OBJECTIONS TO DEBTOR'S CLAIM OF EXEMPTION**
(Homestead Exemption)

This case came before the Court for a two-day trial on Creditors PRN Real Estate &

Investments, Ltd. and Nancy A. Rossman's (collectively "PRN") Objection to Debtor's Claimed

Homestead Exemption (Doc. No. 104) ("PRN's Objection") and Chapter 7 Trustee Lori Patton's

(the "Trustee") Objection to Debtor's Claim of Homestead Exemption (Doc. No. 116) ("Trustee's

Objection") (together, the "Objections").  After considering the evidence admitted at trial and the

governing case law, the Court concludes that the Objections should be sustained in part.  Debtor

William W. Cole, Jr. ("Debtor" or "Mr. Cole") will not be denied his homestead exemption

outright.  But Mr. Cole's exemption must be limited to a half of an acre out of a total of 2.95 acres.

## Jurisdiction

This Court has jurisdiction over this proceeding under 28 U.S.C. §§ 157 and 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## The Real Property

The real property at issue in this matter is located at 608 Bentley Lane, Maitland, Florida, 32751 (the "Property").  The Debtor owns the Property under a revocable self-settled trust.  Joint Pretrial Statement (hereafter "Jnt. Stip.") ¶¶ 2–8.  (Doc. No. 373).  The Property is located within the City of Maitland, Florida and consists of approximately 2.95 acres, which sits upon and extends into Lake Minnehaha.  Jnt. Stip. ¶¶ 9, 16.  The Court will refer to the approximate .765 acres of the parcel that is above the ordinary high water mark and upon which Debtor's 10,000 square foot home is located as the "Upland Property."  The Court will refer to the remaining 2.185 acres of the parcel that is below the ordinary high water mark and which extends into Lake Minnehaha as the "Submerged Land."  *See* Jnt. Stip. ¶ 9.

## Issues for Decision

1.      Whether the Debtor's homestead exemption should be denied outright because of the Debtor's prepetition efforts to "gerrymander" the exemption.[1]

2.      If the Debtor is entitled to claim a homestead exemption at all, (a) whether the Submerged Land should be considered in determining the total acreage of the Debtor's homestead and (b) the proper method of allocating value to the homestead exemption.[2]

## Governing Standards

The procedures for claiming any property as exempt and for the resolution of any objection to the exemption are governed by Rule 4003 of the Federal Rules of Bankruptcy Procedure ("Rule(s)").  Because a debtor's claim of exemption is presumptively valid under 11 U.S.C.

§ 522(l),[3] the party objecting to a claimed exemption bears the burden to show that the exemption is not properly claimed. Rule 4003(c); *see, e.g.*, *Silliman v. Cassell (In re Cassell)*, 688 F.3d 1291, 1294 (11th Cir. 2012); *In re Gentry*, 459 B.R. 861, 863 (Bankr. M.D. Fla. 2011).

At issue here is the Debtor's claim of exemption in his homestead, asserted under Article X § 4 of the Florida Constitution, which provides in part:

> (a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for the house, field or other labor performed on the realty, the following property owned by a natural person:
>
> (1) a homestead . . . if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or his family.

This exemption from forced sale is "designed to protect and preserve the family home."[4] It is often said that, "[a]s a matter of public policy, the Florida homestead exemption should be liberally construed in favor of the party seeking the exemption."[5] At the same time, a court should not construe the exemption "so liberally that they become 'instruments of fraud, an imposition on creditors, or a means to escape honest debts.'"[6]

The relevant date for determining whether a debtor is entitled to a claim of exemption is the petition date.[7]

## FINDINGS OF FACT[8]

A.    *Debtor's Prepetition Acts and Statements as to the Property*

Mr. Cole acquired the Property in 2001.[9] He and his wife Terre Cole moved onto the Property in 2002 or 2003, after construction of the residence.[10] Except for a period between May

2009 and November 2014, Mr. Cole has lived on the Property since he acquired it.  At all relevant times, either Mr. Cole or his family have resided on the Property.[11]

Mr. Cole holds title to the Property under a self-settled revocable trust, which held title to the Property--as a single intact parcel--in a series of deeds until approximately three months prior to the petition date.[12]  In May 2015, Mr. and Mrs. Cole, as co-trustees, executed and recorded a special warranty deed conveying--from the trust to the trust--the Property less the Upland Property and a small portion of the Submerged Land containing, primarily, a dock and boathouse.[13]  In June 2015, Mr. and Mrs. Cole executed and recorded a second special warranty deed to correct an error in the May deed.  The June deed conveyed the Submerged Land less the same small portion of the beachfront and the area surrounding the dock and boathouse, again from the trust to the trust.[14] The Submerged Land does not front a road and is accessible only by water.[15]

Mr. Cole designated the boundary line used to split the Property.  In late January 2015, Mr. Cole emailed Kevin Cavone, a surveyor, a copy of an old survey of the Property and asked that Mr. Cavone "have [it] broken out into two surveys."[16]  Mr. Cavone's surveys were used to prepare the legal descriptions in the May and June 2015 special warranty deeds.[17]

At various times, Mr. and Mrs. Cole have listed the Property for sale.[18]  When listed, the Multiple Listing Service listing described the property for sale as 2.95 acres.[19]

In May 2009, Mr. and Mrs. Cole executed an "Affidavit of Trustee" in conjunction with a request for Fidelity National Title Insurance Company to issue a title insurance policy on the Property.  The affidavit provides a legal description consisting of the entire Property and states the Property is the "homestead property" of the trust's settlor (Mr. Cole) or his family.  No reference is made to a potential interest held by the State of Florida to the Submerged Land.[20]

4

Mr. Cole has paid the real property taxes assessed against the Property since acquiring it through the petition date.  The Property is taxed as a single parcel.[21]  In a November 2013 email to Mr. Cole, Mrs. Cole questioned whether they were paying inflated real estate taxes based upon the tax rolls listing the Property at 2.9 acres.  Mr. Cole responded: "We are not overpaying.  It shows it is on the water."[22]

B.    *Debtor's Schedules*

Mr. Cole filed this chapter 7 case on July 27, 2015.[23]  His sworn schedules were timely filed on August 10, 2015.[24]  To date, Mr. Cole has never amended his schedules.

Schedule A lists two parcels of real property.  First, "608 Bentley Lane, Maitland, Florida 32751", in which Mr. Cole claimed ownership via the trust and homestead status.  Mr. Cole estimates the value of this parcel at $2.5 million.  Second, a parcel in Orange County described in an attached exhibit, "A-1", in which Mr. Cole again claimed ownership under the trust but no homestead status.  Mr. Cole estimates the value of this parcel at $1,000.  Exhibit A-1 contains a legal description which is identical to the legal description contained in the June 2015 special warranty deed.[25]

Schedule C claims the "608 Bentley Lane, Maitland, Florida 32751" parcel as exempt pursuant to Article X § 4(a)(1) of the Florida Constitution.  Mr. Cole claims the "Full Value" as exempt, which, consistent with his Schedule A, is estimated at $2.5 million.[26]

Neither Schedule A, including Exhibit A-1, nor Schedule C make any reference to the size of the parcels.[27]  Nor do they indicate that the parcels are contiguous.

C.    *Debtor's Rule 2004 Examination Testimony Regarding the Splitting of the Property*

Asked to explain the reason for executing the May and June 2015 special warranty deeds (together, the "Warranty Deeds"), Mr. Cole testified in his 2004 exam that it was "just to call out

what was useable land and what was unusable land."[28]  He added that there was also some concern about potential liability given that a water ski course laid within the waters over the Submerged Land.  This threat of liability notwithstanding, Mr. Cole acknowledged that the Warranty Deeds did not change the ownership of the Property.[29]

As to the lake parcel identified in Exhibit A-1 of his Schedule A,[30] Mr. Cole admitted that the parcel was not accessible by land and did not front a road.[31]  He evaded labeling the Submerged Land as unmarketable yet acknowledged it "[w]ouldn't have any value to me."[32]  Asked, hypothetically, if he would ever sell the Submerged Land apart from the Upland Property, Mr. Cole testified:  "Not without some compelling reason."[33]

Mr. Cole first stated that he believed that the City of Maitland would not care if he tried to sell the Submerged Land separately from the Upland Property.  But he quickly qualified this statement, noting that the City had cared (and disallowed it) when he had shortly before requested to split a lot on the opposite side of Lake Minnehaha.  Mr. Cole further claimed that at one point, the City had suggested he deed the submerged lands to the State of Florida.  He could provide no details of this claim, other than to say that the matter "came up" at a zoning hearing.[34]

D.    *Testimony Adduced at Trial*

1. Debtor William W. Cole, Jr.

Debtor, who holds a bachelor's in accounting from the University of Florida, has been a real estate investor and developer for more than twenty years.  Mr. Cole has experience reviewing real estate documents such as surveys, tax maps, title commitments, and title insurance policies.[35]

Mr. Cole identified several errors in his bankruptcy schedules and initial disclosures.  But he indicated no errors on his Schedule A or C.[36]  Mr. Cole acknowledged that by recording the Warranty Deeds, he warranted "to the world" that the trust owned the Property and more

specifically, the Submerged Land.  The Warranty Deeds contain no indication that the trust lacked

any interest or right in the Property or that the Property was held in any lessor capacity other than

as full title owner.[37]

As to real estate taxes, Mr. Cole claimed that he believed that the taxes were assessed only

as to the Upland Property.  But he acknowledged that the Property was taxed as a single parcel.[38]

Mr. Cole attended a mediation of his dispute with PRN on January 26, 2015.  The mediation

resulted in an impasse.  Two days later, Mr. Cole sent the email to Mr. Cavone requesting the old

survey of the Property be divided in two.[39]  At trial, Mr. Cole explained his email and the "unusual

request" it contained as follows:

> Because I was trying to identify since the mediation didn't go well, I wasn't quite
> sure what was going to happen, I still hoped we were going to settle, but began a
> process of identifying what I considered to be my homestead parcel.[40]

Mr. Cole admitted that he directed Mr. Cavone to use a boundary line other than ordinary high

water mark because he wanted to ensure his boathouse was protected.[41]  Mr. Cole discounted the

suggestion that his request to divide the survey was made solely for purposes of "pre-bankruptcy

planning."  But he did acknowledge that bankruptcy might have been *one* of the reasons.[42]

Regarding the splitting of the Property, Mr. Cole claimed he did not intend to create a

second lot and denied that he did so pursuant to the City's code.[43]  He admitted that he did not

obtain any type of approval from the City before executing the Warranty Deeds.[44]  And in contrast

to his Rule 2004 testimony, Mr. Cole admitted that the Submerged Land, by itself, was not

marketable.[45]  Mr. Cole characterized his execution of the Warranty Deeds as a "bifurcation of a

deed."[46]  Despite his experience obtaining a variance in order to split similar parcels, he did not

seek a variance in regard to the Property because "[he] didn't think it was necessary."[47]

Mr. Cole acknowledged that he made no claim that the State of Florida owned the Submerged Land at his Rule 2004 examination.[48]  He also acknowledged that in executing the Warranty Deeds, he deeded the land, effectively, back to himself rather than to the State of Florida.[49]  These acknowledgments notwithstanding, Mr. Cole stated that his claim that the state owned the Submerged Land was not newly invented, but rather he had shared his belief with "several people."  The only individual he could specifically identify, however, was counsel.[50]

Mr. Cole pointed to the sovereignty exception in his title insurance policy for the Property as the basis of his belief that the state owned the Submerged Land.[51]  Though he acknowledged he could have asked to have the exception removed, he did not do so because, in his experience as a developer, title insurance companies would not remove such an exception.[52]  Mr. Cole could not say if in those prior cases where an insurer denied his request to remove a sovereignty exception, there was, as here, a patent out of the United States without a reservation of rights involved.[53]

2. Sara Blanchard, Chief Planner, City of Maitland

Ms. Blanchard, who holds a master's degree in Urban and Regional Studies, has been employed by the City of Maitland for thirty-two years.  Ms. Blanchard is currently the City's Chief Planner and has served also as a planner, zoning administrator, and senior planner.  In her current position, Ms. Blanchard oversees land development and growth management issues for the City, including reviewing proposed construction projects.  She drafts ordinances related to these issues and is the representative to the City's planning and zoning commission.[54]

Ms. Blanchard testified that where a property owner attempts to divide a single parcel of real estate into two, the City refers to this partitioning as a "lot split."  The City's code requires that a lot split be approved by the City, except where the lot split involves a transfer of small portions of land between adjoining property owners.[55]  There is a varying degree of process

involved in obtaining the City's approval.  Once approved, the property may be split and recorded in the public records.[56]

As part of her regular duties, Ms. Blanchard is involved in the review of proposed lot splits. In this regard, Ms. Blanchard is responsible for ensuring that a proposed lot split is consistent with the requirements of the City's code and determining whether a variance is needed.[57]  She is also responsible for preparing "zoning confirmation letters," which are letters that put forth the City's position on questions posed in matters effecting the zoning of real property within the City.[58]  Two zoning confirmation letters authored by Ms. Blanchard, one dated May 5, 2016, and addressed to PRN's counsel and a second dated August 12, 2016, and addressed to Debtor's counsel, were admitted at trial.[59]

Consistent with her May 5 letter, Ms. Blanchard testified that Debtor's splitting of the Property would have required City approval.[60]  Debtor did not seek the City's approval before executing and recording the Warranty Deeds, nor had the City taken any step in any process that might lead to granting its approval.[61]  Ms. Blanchard testified that Debtor's partitioning of the Property did not conform with the City code's lot width requirements and, therefore, a variance would be needed.[62]  It is undisputed that Debtor did not apply for a variance.[63]  At a minimum, Debtor's splitting of the Property violated Section 21-6 of the City's zoning code because of the failure to adhere to lot width requirements.[64]  The Submerged Land specifically failed to comply with applicable lot width requirements because it lacked any street frontage.[65]

Ms. Blanchard testified that the intent of a property owner is not considered in determining whether a particular act constitutes a lot split.[66]  Whatever Mr. Cole's intentions may have been, "the creation of a separate parcel did partition the site, creating a new lot."[67]

3.  James R. Dyer, Vice President, First American Title

Mr. Dyer, a Vice President with First American Title, has been employed as an underwriter and title examiner for about 32 years.  He is certified as a land searcher by the Florida Land Title Association and is licensed to sign title policies and commitments.[68]  Mr. Dyer is regularly called upon to make determinations as to the ownership of a specified parcel of real estate, primarily for the purpose of risk assessment.  His experience includes determinations of whether submerged land in Florida is subject to private ownership.  Mr. Dyer has never had one of his title determinations rejected by a court of law.[69]  The court accepts Mr. Dyer as an expert on title.

As to the Submerged Land, Mr. Dyer opined that the parcel was owned by Mr. and Mrs. Cole as co-trustees of the trust and not by the State of Florida.[70]  His opinion is based upon a chain of title going back to an indenture dated June 4, 1873, between Robert C. Parton, as grantor, and Richard H. Marks, as grantee.[71]  The gap period between 1845, when Florida became a state, and 1873 was not a concern for Mr. Dyer because, within the chain of title, he located a patent from the United States to Mr. Parton, which did not contain a reservation of rights.[72]  And under Section 253.141(2), Florida Statutes, because there was a patent from the United States to a private individual, the Submerged Land would not be sovereign land owned by the State of Florida.

Mr. Dyer explained that a sovereignty exception, like the one in Mr. Cole's title policy, is standard practice when a parcel includes lands submerged beneath a water body.  As true with any title exception, however, a sovereignty exception may be removed from a policy (although it is rare) if removal is requested and supported by the research into the chain of title.[73]  When asked to remove a sovereignty exception, Mr. Dyer searches the land records for a deed out of either the United States or the State of Florida.[74]  Mr. Dyer opined that based upon his review of the chain

of title for the Property, had he been writing Mr. Cole's title policy and been asked to remove the sovereignty exception, he would have done so.[75]

4. Joe Knetsch, Ph.D.

Now retired, Dr. Knetsch served for 28 years as a historian for Florida's Division of State Lands.  His primary task was researching whether water bodies in the state were navigable at the time Florida became a state for purposes of determining whether the land underneath was owned by the State of Florida.[76]  Dr. Knetsch has authored several books and numerous articles on topics in Florida history, including the history of surveying in Florida, the history of the public trust doctrine, and the Seminole wars.[77]  The court accepts Dr. Knetsch as an expert in Florida history.

In researching whether Lake Minnehaha, and other water bodies more generally, was navigable in 1845, Dr. Knetsch stated there was not a wealth of witness accounts to rely on because Florida was not well developed at the time it became a state.  He therefore examined other matters such as map history, surveys, and surveyor field notes.  He also looked at military records, basically "whatever might apply to showing the existence or nonexistence of a water body."[78]  And from there, he examined whether the water body was used "in the customary use of the day."  Customary use might include activities ranging from recreation to commerce.[79]

The earliest evidence of navigability of Lake Minnehaha that Dr. Knetsch located was a 1879 map of Orange County, issued by surveyor E.R. Trafford.[80]  Later maps also reflect the existence of the lake.[81]  Dr. Knetsch discovered no historical evidence that Lake Minnehaha, nor any of the lakes in the same chain, ever disappeared and later reappeared as has occurred with several other lakes in different parts of the state.[82]

Most maps of the period between 1840 to 1860 do not detail the southern part of the state. Dr. Knetsch owns copies of several.[83]  Of the well-known maps of the period, none show Lake Minnehaha.[84]  But Dr. Knetsch cautioned, "they don't show a lot of others."[85]

Other evidence of Lake Minnehaha's navigability included photographs obtained from the state archives taken around 1885 depicting a boat on Lake Minnehaha,[86] the Chronological History of Winter Park, Florida published in 1950, which describes boats traveling the various canals and lakes in the area,[87] a book published in 1972 about historic homes in Maitland describing a "majestic boathouse" at one home on the east side of Lake Minnehaha which was described as a social scene in the early 1900s,[88] and a 2011 book discussing canal tourism in the area in 1937.[89] Dr. Knetsch acknowledged, however, that the canals connecting the lakes in Lake Minnehaha's chain did not exist in 1845 and were constructed in the 1890s to facilitate the logging industry.[90]

Dr. Knetsch also examined the field notes of surveyors of the time.  He noted that in 1845, the majority of Florida had not been surveyed.[91]  Dr. Knetsch examined one particular survey performed by Henry Washington in 1843.  The survey does not mention Lake Minnehaha, however, this was not unexpected as the lake did not cross the lines Washington was directed to survey.  But Washington's field notes reflect a marsh extending in the lake's direction.  Dr. Knetsch conceded that Lake Minnehaha was never meandered.[92]  And as he further acknowledged, it is the law in the State of Florida, that a non-meandered lake is presumably non-navigable and therefore would not be sovereign land owned by the State of Florida.

To his knowledge, the State of Florida has not asserted an ownership claim to the lake.[93]

Based upon the sum of his research and experience, Dr. Knetsch opined that Lake Minnehaha was likely a navigable water way in 1845 when Florida became a state.[94]  Accordingly, he offered that any submerged land below the ordinary high water mark would be sovereign land

owned by the state.[95]  He acknowledged, however, that based on the available historical record, it cannot be known for certain whether Lake Minnehaha either existed or was navigable in 1845.[96]

## CONCLUSIONS OF LAW

I.    **Debtor's Entitlement to a Homestead Exemption**[97]

(a) Arguments of the Parties

PRN (but not the Trustee) asks the Court to deny Mr. Cole his homestead exemption in its entirety based upon his prepetition split of the Property into the Upland Property and the Submerged Land.  PRN asserts that this was an impermissible (and fraudulent) attempt to gerrymander his homestead exemption at the expense of his creditors.  In support of its argument, PRN relies on *In re Englander*, 156 B.R. 862 (Bankr. M.D. Fla. 1992), *aff'd*, 95 F.3d 1028 (11th Cir. 1996).[98]

Debtor responds that an outright denial of his homestead exemption based upon his prepetition conduct is not only contrary to the policies underlying the exemption but also unsupported by law.  Debtor argues that based upon *Law v. Siegel*, 571 U.S. 415 (2014), and *Havoco of Am., Ltd. v. Hill*, 790 So. 2d 1018 (Fla. 2001),[99] neither gerrymandering nor any other type of "pre-bankruptcy planning" provides a basis for a bankruptcy court to deny an otherwise properly claimed homestead exemption.

(b) Analysis

Under the Florida Constitution, the Debtor's homestead exemption is limited to one-half acre because the Property lies within the City of Maitland.  Debtor timely claimed the exemption on his Schedule C, albeit limited to the Upland Property.  Accordingly, Debtor's homestead claim is presumptively valid.  11 U.S.C. § 522(l).

PRN argues that the Court should reject the claim of exemption outright due, essentially, to fraud.  In support of its argument, PRN cites to the Debtor's failure to expressly note the acreage limitation on his Schedule C, his impermissible splitting of the Property on the eve of the bankruptcy filing, his illogical explanations for the illegal lot split, and his eleventh-hour change in position regarding the ownership of the Submerged Land.  PRN analogizes Mr. Cole's conduct to the debtors' conduct in *In re Englander*.  And PRN notes that the bankruptcy court in that case stated that debtors might have suffered a "total denial" of their homestead exemption had the issue not been one of first impression.[100]

The facts in *In re Englander* are similar to the facts at issue here.  In that case, the debtors lived on just over an acre of lakefront property in the City of Winter Park, Florida, a neighbor of Maitland.  The Englanders attempted to gerrymander their exemption by designating as exempt a one-half acre plot containing the residence, which encircled the rest of the parcel.  The property the debtors designated as non-homestead was useless, with no access to roads, utilities, or lakefront.[101]  After concluding that the property at issue could not be so divided, the Court ordered a sale of the property and the apportionment of the proceeds as between debtors and the bankruptcy estate, noting:

> The misleading and fraudulent actions [of the debtors in gerrymandering the property] could have resulted in a total denial of the debtors right to claim a homestead exemption in his residence. However since the issues in this case had not been directly addressed by a Court construing Florida law before today . . . , this Court believes that total elimination of his homestead is too severe a punishment and holds that these debtors should be allowed to claim a fair share of the proceeds from the sale of their residence.[102]

The bankruptcy court's suggestion that a homestead exemption might be denied in its entirety was *dicta* and was not adopted by the Eleventh Circuit on appeal.  Rather, the Eleventh

Circuit focused on and ultimately endorsed the bankruptcy court's "equitable solution" to the problem of how to honor a debtor's homestead exemption when the property claimed as exempt exceeds the acreage limitation in the Florida Constitution and is indivisible.[103]  The Eleventh Circuit did not mention the bankruptcy court's finding that the Englanders had claimed their homestead exemption in bad faith, nor did it discuss exceptions to the homestead exemption more generally.[104]

PRN has not identified any post-*Englander* case where a debtor was denied the homestead exemption outright because the court found the debtor had gerrymandered the exemption.  And importantly, since the *Englander* decision, the Eleventh Circuit has issued its decision in *Havoco*, which forecloses PRN's argument.

*Havoco* began in the U.S. Bankruptcy Court for the Northern District of Florida.  There, creditor Havoco of America, Ltd. objected to the chapter 7 debtor's homestead exemption on the basis that the debtor converted non-exempt assets into exempt ones, including the homestead, "with the intent to hinder, delay, or defraud his creditors."[105]  The bankruptcy overruled the creditor's objection, concluding that Florida law did not prohibit the conversion of non-exempt assets into an exempt homestead even when the debtor does so with the specific intent to place assets beyond the reach of his creditors.  The district court affirmed.[106]  On appeal, the Eleventh Circuit certified the following question to the Florida Supreme Court:

> Does Article X, Section 4 of the Florida Constitution exempt a Florida homestead, where the debtor acquired the homestead using non-exempt funds with the specific intent of hindering, delaying, or defrauding creditors in violation of Fla. Stat. § 726.105 or Fla. Stat. §§ 222.29 and 222.30?[107]

The Florida Supreme Court answered the certified question in the affirmative.  After a detailed review of its homestead related jurisprudence, including its cases involving equitable

liens, the Florida Supreme Court concluded:

> The transfer of nonexempt assets into an exempt homestead with the intent to hinder, delay, or defraud creditors is not one of the three exceptions to the homestead exemption provided in article X, section 4. Nor can we reasonably extend our equitable lien jurisprudence to except such conduct from the exemption's protection. We have invoked equitable principles to reach beyond the literal language of the exceptions only where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead.[108]

In reaching its holding, the court observed that "in harmony" with the liberal construction of the homestead exemption is the "strict construction as applied to the exceptions."[109]  Though the court acknowledged that it had "strayed from the literal language of the exemption where the equities have demanded it" (*i.e.* the equitable lien cases), the court added that it had done so only in the rarest of circumstances and then only with "due regard" to the provision's three exceptions.[110]

With the certified question answered, the Eleventh Circuit affirmed.[111]

It is clear therefore that Florida law does not permit the outright denial of a debtor's homestead exemption based upon allegations of fraud, no matter how egregious, unless funds obtained through such fraud were then used "to invest in, purchase, or improve the homestead."[112] And gerrymandering a homestead exemption, the very purpose of which can only serve to minimize value due the estate and "cheat" creditors, is simply a species of fraud.

The Court does not condone Mr. Cole's conduct in this case.  His sworn schedules in this case are misleading.  His explanations for the lot split are not credible.  But under Florida law, he is nevertheless entitled to his constitutional homestead exemption.[113]  Accordingly, to the extent PRN's Objection seeks to deny Mr. Cole's homestead exemption outright, it is overruled.

**II.    The Submerged Land as Part and Parcel of the Homestead**

(a) Arguments of the Parties

Both PRN and the Trustee argue that the Court should find that the Submerged Land belongs to the Debtor and must be included along with the Upland Property in evaluating Mr. Cole's homestead exemption claim.

Debtor, on the other hand, argues that the Submerged Land belongs to the State of Florida and may not be considered by the Court in apportioning the value due to his homestead claim.

(b) Analysis

Without doubt, the issues surrounding the ownership of the Submerged Land are both fascinating and complex. Both PRN and Debtor have presented reasoned arguments. And both PRN's and Debtor's experts provided compelling and credible testimony. But in the end, the Court finds that it need not decide the issue given the Eleventh Circuit's decision in *In re Kellogg*.[114]

In *Kellogg*, a chapter 7 debtor claimed the homestead exemption on his Palm Beach oceanfront property, which was located within the city and was approximately 1.3 acres in size. The debtor claimed the entire parcel, which he noted was "indivisible," and valued his exemption based on the tax assessor's value for the entire parcel. The chapter 7 trustee objected to the debtor's claimed exemption. At trial, the court heard testimony from the Palm Beach zoning administrator. The administrator testified that under applicable zoning laws, the debtor could not legally subdivide his property.[115] Based upon this testimony, the bankruptcy court ordered that the property be sold and the proceeds apportioned.[116]

On appeal, the Eleventh Circuit examined whether the debtor should be allowed to carve out a half-acre portion of his property to keep as his homestead.[117] Citing *Englander*, the court

concluded that the bankruptcy court correctly directed a sale of the property and the apportionment of the proceeds.[118]

In its analysis, the Eleventh Circuit held that where property claimed as homestead is located within a city and exceeds the one-half acre limitation, a debtor may reasonably designate a portion that is exempt "so long as the remaining portion has legal and practical use."[119]  In Mr. Kellogg's case, the court noted that any non-exempt portion would have no such use to the chapter 7 trustee because to convey that portion would violate local zoning laws.  The court therefore rejected Mr. Kellogg's attempt to designate an exempt half-acre to retain as his homestead.  In doing so, the court noted that if the debtor "could not lawfully divide his land into two parcels before declaring bankruptcy, he should not be allowed to use his homestead exemption to circumvent zoning regulations after filing his petition."[120]  Because he had failed to obtain a variance before the filing, the court determined that it must consider the property indivisible.  The circuit rejected, on procedural grounds, the debtor's argument that he could obtain the necessary zoning variance, if allowed to pursue the matter.[121]

Unwilling to concede defeat, the debtor argued that the constitutional homestead exemption cannot yield to local zoning ordinances.  Dismissing the argument, the court noted that after the sale, the debtor could use his share of the proceeds to purchase a new homestead.

> The Florida constitution grants Kellogg the right to exempt up to one-half acre of municipal property; it does not grant him the inalienable right to homestead in his particular part of Palm Beach, where he chose to live knowing his property could not be subdivided into an exempt one-half-acre parcel.[122]

Here, as in *Kellogg*, Mr. Cole seeks to circumnavigate local zoning regulations and protect his homestead claim by asking the Court to overlook the fact that his splitting of the Property was not allowed under local zoning laws.  There is no dispute that Mr. Cole never sought a variance,

even after the fact, to bless his partition of the Property.  And it is undisputed that as of the petition date, Debtor had record title to both the Upland Property and the Submerged Land.  Granted, Mr. Cole's partitioning of the Property was accomplished prepetition, but it is without dispute that the partition, without a variance, would not be legally permissible under the City of Maitland's zoning code.  Further, Mr. Cole admits that the Submerged Land by itself is of little value and utility. Thus, by his own admission, the designated non-exempt portion of the Property would have no practical use to the Trustee.[123]  Accordingly, under the rubric of *Kellogg*, the Court must treat the Property as indivisible[124] and directs the sale of the Property and allocation of the proceeds.

The Court also declines to decide the issue of the ownership of the Submerged Land as a matter of equity.  If the Court were to decide the issue, it would give support to Mr. Cole's blatant and inequitable actions in partitioning the Property on the eve of his bankruptcy filing.  At trial, Mr. Cole attempted to explain away the Warranty Deeds, characterizing his actions as a mere "bifurcation of Deed," by saying he did not intend to create another lot and did not do so pursuant to the City's code.[125]  His testimony, however, is contradicted by Ms. Blanchard, who testified that whenever a property owner divides a single parcel of real estate into two the City considers it a lot split and that a property owner's intentions have no bearing on the matter.  Mr. Cole also testified that he believed he was taxed only on the Upland Property and that he believed a variance would not be required.  But Mr. Cole's admitted expertise in matters of real estate belies his assertions of ignorance.  Further, as PRN notes, Mr. Cole did not offer any of this testimony at his Rule 2004 examination.

In the end, Mr. Cole attempts to explain his splitting of the Property as simply trying to identify his homestead parcel.  The Court does not find Mr. Cole's testimony on the issue to be credible.  For that matter, Mr. Cole ignores the fact that the Upland Property in which he claims

his homestead exemption by itself exceeds one-half acre, a fact he does not clearly identify in his bankruptcy schedules.  Further, on the ownership issue, the Court cannot overlook the fact that he did not use the ordinary high water mark as the dividing line between the two parcels, as would be the case if Mr. Cole truly believed at that time that the Submerged Land belonged to the State of Florida.  And despite ample opportunity to do so, Debtor has never amended his schedules to disclaim ownership of the Submerged Land, nor did he include, at trial, this among the inaccuracies he testified to in his schedules.

And last, as suggested by the Trustee, the Court does not believe that it is the proper court to determine the issue of title to the Submerged Land as between the Debtor and the State of Florida.  If almost 150 years of record title history are to be tossed aside, particularly in the absence of a contrary claim to title, it is for a state court of competent jurisdiction to do so.

The State of Florida may well have a claim to the Submerged Land and to all of Lake Minnehaha for that matter.  But according to Dr. Knetsch, it has yet to assert any such claim.  The court is unaware of any authority that would allow it to place record title in the Submerged Land into the state against its wishes, much less without its participation.[126]  And the court cannot ignore the effect such a ruling might have on the interests of third parties who had no part--or even *notice* --of this proceeding.  Other private owners of property on Lake Minnehaha, the City of Maitland and its residents, and the likely cadre of secured mortgage creditors, all could be adversely impacted.  The only winner, it seems, would be the Debtor.

In sum, the court views the matter of the state's interest, if any, in the Submerged Land as a potential cloud on title.  This may impact the value the Trustee ultimately obtains for the Property upon sale or may impact some future owner if and when the state elects to lay claim to the Submerged Land or Lake Minnehaha more generally.  But for purposes of this case and in

determining Debtor's homestead exemption, the Court concludes that it must assume that Debtor

owns all of the Property as a single indivisible parcel.

### III.    Allocating Sale Proceeds to Value Debtor's Homestead Claim

The Parties agreed not to include valuation issues as part of the trial on the homestead

exemption claim.  Accordingly, the Court decides only the method by which the Court will allocate

the net proceeds of the sale once the Property's value is ascertained.

(a) Arguments of the Parties

Both PRN and the Trustee contend that Florida law requires the Court to allocate the net

sale proceeds on a percentage basis calculated by comparing the allowed exempt acreage to the

total acreage of the Property.  In support, they rely on *Quraeshi v. Dzikowski (In re Quraeshi)*, 289

B.R. 240 (S.D. Fla. 2002).  Applying the formula as argued by PRN and the Trustee, Debtor would

be entitled to 16.9% of the net proceeds.

Debtor asks the Court to apply the methodology used by the Eighth Circuit in *O'Brien v.

Heggen*, 705 F.2d 1001 (8th Cir. 1983), a case upon which the Eleventh Circuit relied for another

reason in *Englander*.  Debtor's proposed methodology for determining the Trustee's share would

require a court to determine the value per square foot of the subject real property in its *unimproved*

state--therefore allowing the Debtor to retain the full value of his residence--and then multiply that

value by the number of square feet the property exceeds the allowed acreage exemption.  Debtor

acknowledges, but attempts to distinguish, *In re Quraeshi*.

(b) Analysis

Several cases, including *Englander* and *Kellogg*, hold that where a homestead property

exceeds the acreage limitation and is indivisible, the appropriate means by which to honor the

claimed homestead, while also providing value to creditors, is to direct a sale and allocate the net

proceeds as between the debtor and the estate.  But none of these cases goes further to discuss how that allocation is to be made.[127]   The parties have identified what appears to be the sole case interpreting the Florida homestead exemption in these circumstances--*In re Quraeshi.*

The *Quraeshi* court, citing the homestead provision's plain language, including its express exceptions, stated that "it would seem that a debtor's homestead exemption would extend to a *pro rata* portion of the net proceeds of a sale of debtor's property, based on his acreage share of the property sold, rather than a *pro rata* portion of the gross sales price."[128]   Thus, the court proposed that the sale proceeds should be allocated based upon a simple percentage of the exempt acreage to the total acreage of the property.  But as Debtor correctly points out, the *Quraeshi* court was not faced with the precise question here, rather the court addressed the related inquiry of whether the apportionment was to be based upon the net proceeds of the sale or the gross sale price.[129]

Notwithstanding the differing inquiry, this Court agrees with the *Quraeshi* court that the proper method of allocating the net proceeds in these circumstances should be a simple percentage of the exempt acreage to the total acreage of the subject property.

First, this method best aligns with the language of the Florida Constitution.  "While the Florida Constitution does not define the term 'homestead,' it does provide various limitations and requirements.  Among these are an acreage limitation, an ownership requirement, and a residency limitation."[130]   Noticeably absent is any value limitation.[131]   The Court therefore agrees with the Trustee that were it to accept Debtor's proposed value-based allocation method, it would introduce into Florida homestead law an element not supported by the language of the constitution.

Second, this method is consistent with the approach used by courts when evaluating the residency limitation contained in the homestead exemption when the property is used for additional purposes other than the debtor's residence.  For example, in *In re Wierschem,*[132] debtors lived in

one of three units in one of two dwellings on their beach front property.  Debtors rented out the remaining five units.[133]  The court directed that upon sale of the property, the trustee would allocate the proceeds based upon the square footage of debtors' unit as a percentage of the total square footage attributable to the dwelling units.[134]

Third, this method is consistent with the public policies underlying the homestead exemption.[135]  "The [homestead] exemption is intended to protect the family home and not to unjustly impose upon the rights of creditors."[136]  Concentrating the value of a parcel of real property into that portion of the property occupied by the residence, as advocated by the Debtor, may serve the former aim but not the latter.  In fact, where realty is not severable, it would necessarily affect a windfall to a debtor while unjustly prejudicing the rights of creditors.  The homestead exemption aims "to promote the stability and welfare of the state by securing to the householder a home, so that the homeowner and his or her heirs may live beyond the reach of financial misfortune and the demands of creditors."[137]  The exemption is not intended to protect a debtor's standard of living, particularly where that standard might be found to be luxurious or excessive.[138]

Fourth, this method provides a simple formula of easy application.  It avoids expensive and protracted litigation over valuation issues, which likely would require the use of expert testimony. The method the Court adopts today conserves costs to the parties as well as judicial resources.  It also avoids potential gamesmanship by debtors seeking in bad faith to increase their exemption at the expense of the bankruptcy estate and the trustee, who must defend such tactics.  And because of the ease of application, the method also serves the Bankruptcy Code's goal of efficient administration of the estate.

Debtor's attempt to distinguish *Quraeshi* is not persuasive.  And his reliance on *O'Brien* is misplaced.  Although the Eleventh Circuit relied on *O'Brien* in *Englander*, it did not do so for the principals relating to the allocation of the sale proceeds.[139]  Moreover, the Eighth Circuit in *O'Brien* did not conclude that the valuation methodology employed by the bankruptcy court was "the" proper methodology to be used.  Rather, it found that the bankruptcy court's factual finding as to the apportionment of value to the non-exempt portion of the property was supported by the evidence and not clearly erroneous.[140]

For these reasons, the court concludes that the proper method of allocating the net proceeds in this case should be a simple percentage of the exempt acreage to the total acreage of the property.

## CONCLUSION

Despite Mr. Cole's inequitable and incredulous attempt to gerrymander his homestead exemption, Florida law commands that he cannot be denied his constitutional homestead exemption on that basis.  But the Court will disregard his illegal partitioning of the Property, treat the entire parcel as indivisible, and direct its sale and the allocation of the proceeds.  The Court concludes that the net proceeds should be allocated as between the Debtor and the Trustee based on a simple percentage of the allowed exempt acreage to the total acreage of the Property.

The Court will enter a separate Order consistent with this Memorandum Decision.

Service of this Memorandum Decision, other than by CM/ECF, is not required as the interested parties are registered CM/ECF users.  Local Rule 9013-1(b).

---

[1] Gerrymandering is more frequently used in the political arena in which the term originated.  The term is used to describe the manipulation of the geographic boundaries defining an electoral district in order to favor one political party.  In the homestead context, it is used to describe a debtor's designation of his exempt homestead within a parcel of real property that exceeds the allowed acreage limitation, with the purpose of either concentrating value within the portion claimed as exempt or rendering valueless that portion not claimed as exempt.

[2] Since trial, the Court entered an order upon joint motion of the Trustee and the Debtor authorizing the sale of the Property subject to specified terms and conditions.  (Doc. No. 632).  Accordingly, the Court need not address the issue of whether the Court may order a sale of the Property.  Debtor acknowledges that the law in this circuit allows the sale

by a bankruptcy trustee of partially-exempt property that is indivisible for purposes of liquidating the estate's interest in the property. However, he suggests that the Supreme Court's holding in *Law v. Siegel*, 571 U.S. 415 (2014), might alter the law in this circuit as to the forced sale of a homestead. The Court respectfully disagrees as *Siegel* is distinguishable. First, a sale in this case would not be directed as a sanction for alleged misconduct. Second, and more importantly, the Court would not need to invoke § 105(a) of the Bankruptcy Code or its inherent power to order the sale as Florida law, which governs the claim of exemption, permits a forced sale in these circumstances. *See Kellogg v. Schreiber (In re Kellogg)*, 197 F.3d 1116 (11th Cir. 1999).

[3] References are to 11 U.S.C. §§ 101–1532 ("Code" or "Bankruptcy Code"), unless indicated otherwise.

[4] *In re Ballato*, 318 B.R. 205, 209 (Bankr. M.D. Fla. 2004); *See also Englander v. Mills (In re Englander)*, 95 F.3d 1028, 1031 (11th Cir. 1996) ("Florida case law dictates that the homestead exemption laws be liberally applied to the end that the family shall have shelter and shall not be reduced to absolute destitution.").

[5] *In re Aloisi*, 261 B.R. 504, 511 (Bankr. M.D. Fla. 2001).

[6] *Kellogg v. Schreiber (In re Kellogg)*, 197 F.3d 1116, 1120 (11th Cir. 1999) (quoting *Frase v. Branch*, 362 So. 2d 317, 318 (Fla. Dist. Ct. App. 1978)).

[7] *See In re Williams*, 427 B.R. 541, 547 (Bankr. M.D. Fla. 2010); *In re Vick*, No. 07-10844-BKC-AJC, 2008 WL 2444526, at *2 (Bankr. S.D. Fla. June 16, 2008) (listing cases).

[8] PRN's Exhibits (Doc. Nos. 367, 382, and 397) shall be noted as "Cr. Ex." or "Cr. Am. Ex." Debtor's Exhibits (Doc. No. 369) shall be noted at "D. Ex." References to the trial transcript shall be noted as "Tr." (Doc. No. 416).

[9] Tr. 73:5–7, 131:1–3; Jnt. Stip. ¶ 7.

[10] Jnt. Stip. ¶ 15.

[11] Jnt. Stip. ¶¶ 3, 17, 18.

[12] Jnt. Stip. ¶ 7; Tr. 72:10–17; Cr. Exs. 4Z–4CC; Cr. Am. Ex. 10.

[13] Cr. Exs. 4DD and 15; Tr. 93:5–20.

[14] Cr. Exs. 4EE; Tr. 96:3–13.

[15] Jnt. Stip. ¶ 20.

[16] Cr. Am. Ex. 10; Jnt. Stip. ¶ 19.

[17] Tr. 95:23–96:2.

[18] Jnt. Stip. ¶ 21; Tr. 78:11–81:25.

[19] Tr. 81:16–84:11; Cr. Ex. 9.

[20] Cr. Ex. 13 and Ex. 13 ¶¶ 3–5; Tr. 76:8–78:8.

[21] Tr. 85:4–86:4; Cr. Ex. 8.

[22] Cr. Ex. 11; Tr. 86:18–87:7.

[23] D. Ex. 1; Jnt. Stip. ¶ 1.

[24] D. Ex. 2; Jnt. Stip. ¶ 4.

[25] D. Ex. 2; Cr. Ex. 4EE; Tr. 96:9–13.

[26] D. Ex. 2.

[27] Notwithstanding the lack of specificity in his Schedule C, Mr. Cole acknowledges that his claim of exemption is limited to one-half acre. Jnt. Stip. ¶ 14.

[28] Cr. Am. Ex. 12, Transcript of Mr. Cole's 2004 Exam ("2004 Exam") 20:9–12.

[29] Cr. Am. Ex. 12, 2004 Exam 20:15–24.

[30] As noted above, the lake parcel created by the June 2015 special warranty deed and described in Exhibit A-1 to Schedule A consists of the submerged land below the ordinary high water mark less a small portion of beachfront and an area surrounding the dock and boathouse. The Court nevertheless, for ease of analysis, refers to this parcel as the Submerged Land. The Court adds this note to make clear that Debtor's partition of the Property did not use the ordinary high water mark as the boundary line in the legal descriptions in the Warranty Deeds, rather he reserved to the Upland Property (and therefore to himself) that small portion of the Submerged Land that he considered particularly valuable.

[31] Cr. Am. Ex. 12, 2004 Exam 117:1–6.

[32] Cr. Am. Ex. 12, 2004 Exam 117:7–10.

[33] Cr. Am. Ex. 12, 2004 Exam 117:16–18.

[34] Cr. Am. Ex. 12, 2004 Exam 117:19–118:25.

[35] Tr. 66:14–67:15.

[36] Tr. 70:3–71:12; *see* Tr. 127:6–12 (stating there were no inaccuracies on Schedule A except for "possibly overstating the values").

[37] Tr. 72:18–73:4.

[38] Tr. 85:25–86:4, 105:21–106:18.

[39] Tr. 88:22–89:5, 90:3–7.

[40] Tr. 91:11–18.

[41] Tr. 93:5–20.

[42] Tr. 93:21–94:3; *see also* Tr. 115:14–22.

[43] Tr. 92:22–93:4, 97:14–17.

[44] Tr. 96:19–22.

[45] Tr. 97:2–4.

[46] Tr. 97:23–98:15.

[47] Tr. 99:16–100:1

[48] Tr. 103:15–104:7.

[49] Tr. 106:24–107:4.

[50] Tr. 109:9–110:23.

[51] Tr. 133:5–135:2, 148:6–14; *see* D. Ex. 3.

[52] Tr. 107:10–108:2.

[53] Tr. 156:18–157:8.

[54] Tr. 169:4–171:15.

[55] Tr. 171:20–172:17.

[56] Tr. 172:18–173:5.

[57] Tr. 173:6–17.

[58] Tr. 175:6–176:16.

[59] Cr. Ex. 24 (May 5, 2016 letter to Mr. Elkins) and Cr. Ex. 39 (Aug. 12, 2016 letter to Mr. Herron).

[60] Tr. 177:23–25.

[61] Tr. 178:4–18.

[62] Tr. 178:19–24.

[63] Tr. 179:24–180:3.

[64] Tr. 179:2–20; *see* Cr. Ex. 24 (suggesting Debtor's actions also violated Section 7.5-90 and Section 16-44).

[65] Tr. 193:4–16; *see also* Tr. 179:2–8, 185:8–11.

[66] Tr. 180:9–12.

[67] Cr. Ex. 39.

[68] Tr. 207:6–210:17.

[69] Tr. 210:20–25, 213:8–214:1, 214:21–24.

[70] Tr. 237:11–238:22, 267:3–14.

[71] Tr. 238:23–239:19, 240:11–242:9, 256:12–14; *see* Cr. Exs. 4A–4EE (less Ex. 4Y).

[72] Tr. 242:10–25, 245:1–20, 254:3–5, 256:19–23, 257:10–259:18; *see* Cr. Ex. 4D.

[73] Tr. 229:24–231:9.

[74] Tr. 235:22–236:3.

[75] Tr. 269:10–270:4, 270:14–21.

[76] Tr. 337:11–24, 339:17–22.

[77] Tr. 338:6–15, 340:7–343:7; *see* D. Ex. 5.

[78] Tr. 352:20–353:19.

[79] Tr. 380:17–381:10.

[80] Tr. 356:3–7, 358:1–9, 381:18–21; *see* D. Ex. 7.

[81] Tr. 359:17–360:18, 363:6–21, 364:18–24; *see* D. Exs. 8 and 9.

[82] Tr. 364:25–369:11.

[83] Tr. 392:11–22.

[84] Tr. 412:10–413:1; *see also* Tr. 392:11–22.

[85] Tr. 412:25–413:1.

[86] Tr. 369:14–371:11; *see* D Ex. 10.

[87] Tr. 371:23–373:15; *see* D Ex. 11.

[88] Tr. 373:17–374:12; *see* D Ex. 13.

[89] Tr. 374:19–375:7; *see* D Ex. 12.

[90] Tr. 383:16–384:2.

[91] Tr. 376:2–5, 376:25–377:1.

[92] Tr. 393:4–394:16, 397:8–398:19, 406:2–8, 418:14–419:21.

[93] Tr. 394:24–395:1, 398:23–399:5.

[94] Tr. 381:11–382:7.

[95] Tr. 376:16–20, 377:16–378:3, 380:8–16.

[96] Tr. 387:18–388:3.

[97] PRN also has argued that the Court should impose an equitable lien in its favor against Debtor's homestead. But PRN has not provided any binding (or persuasive) authority for that proposition on these facts. True, a court is not wholly without authority to impose an equitable lien against a homestead based on a theory of unjust enrichment. *E.g. Palm Beach Sav. & Loan Ass'n v. Fishbein*, 619 So. 2d. 267 (Fla. 1993). However, that particular remedy is available only in the rarest of circumstances, circumstances that do not exist here because there is no evidence that PRN provided value that Debtor used to benefit his homestead. *Havoco of Am., Ltd. v. Hill*, 790 So. 2d 1018 (Fla. 2001). Here, it is clear that PRN is a creditor, if at all, based upon PRN's breach of contract and fraud claims, which are unrelated to Debtor's homestead. *Cf. Flinn v. Doty*, 214 So. 3d 683 (Fla. Dist. Ct. App. 2017) (upholding equitable lien where appellant used alleged ill-gotten funds to pay off a mortgage on her homestead and rejecting imposition of a second equitable lien where alleged ill-gotten funds were not used to satisfy any pre-existing obligation on the home).

[98] PRN also cites *Isaacson v. Isaacson*, 504 So. 2d. 1309 (Fla. Dist. Ct. App. 1987). However, *Isaacson* does not stand for the proposition that a homestead exemption may be denied in its entirety as a result of "reprehensible conduct" of the debtor. Rather, the court stated that an equitable lien may be imposed against homestead property under certain circumstances and then, notably, reversed the imposition of an equitable lien in favor of a child support creditor. *Isaacson* was decided before *Havoco*, 790 So. 2d 1018. And in *Havoco*, the Florida Supreme Court rejected the contention that in addition to the three express exceptions provided in the Florida Constitution, the court had created an unexpressed fourth homestead exception based upon fraud through its equitable lien jurisprudence.

[99] *Havoco*, 790 So. 2d 1018 (Fla. 2001), arose on certified question from the Eleventh Circuit. *See Havoco of Am., Ltd. v. Hill*, 255 F.3d 1321 (11th Cir. 2001) (opinion after certified question answered).

[100] *In re Englander*, 156 B.R. at 871.

[101] *Id.* at 863–64.

[102] *Id.* at 871.

[103] *Englander*, 95 F.3d at 1030–32.

[104] Rather, the Eleventh Circuit noted that "[b]ecause the only exceptions to homestead exemption are those specifically enumerated in the Florida Constitution, courts have refused to create new ones." *Id.* at 1031.

[105] *Havoco of Am., Ltd. v. Hill*, 197 F.3d 1135, 1136 (11th Cir. 1999).

[106] *Id.* at 1136–37.

[107] *Id.* at 1144.

[108] *Havoco*, 790 So. 2d at 1028.

[109] *Id.* at 1021.

[110] *Id.* at 1023–24.

[111] *Havoco*, 255 F.3d. 1321.

[112] *Havoco*, 790 So. 2d at 1028.

[113] *See Havoco*, 790 So. 2d 1018.

[114] *Kellogg*, 197 F.3d 1116.

[115] *Id.* at 1118.

[116] *Id.* at 1118–19.

[117] *Id.* at 1120.

[118] *Kellogg*, 197 F.3d at 1121.

[119] *Id.* at 1120; *see Quraeshi v. Dzikowski (In re Quraeshi)*, 289 B.R. 240, 243 (S.D. Fla. 2002); *see also Siewak v. AmSouth Bank*, No. 8:06-CV-927-T-24EAJ, 2007 WL 141186, at *3 (M.D. Fla. Jan. 16, 2007).

[120] *Kellogg*, 197 F.3d at 1120.

[121] *Id.* at 1119–21.

[122] *Id.* at 1121–22.

[123] Ironically, Mr. Cole acknowledged at trial that the value of the Upland Property is increased because of its proximity to the Submerged Land yet accords none of that added value to the Submerged Land. As discussed, *infra*, it would be inequitable to permit Debtor to ignore that which gives his claimed homestead significant value.

[124] *See also In re Baxt*, 188 B.R. 322, 323–24 (Bankr. S.D. Fla. 1995).

[125] Notably, Art. X § 4 of the Florida Constitution speaks only of "contiguous land." It is not required that the land be a single lot or that the claimant hold title by a single deed. *See, e.g.*, *In re Mohammed*, 376 B.R. 38 (Bankr. S.D. Fla. 2007) (permitting chapter 7 debtors to claim the homestead exemption in each of two contiguous lots, of which one was vacant and one contained their residence, even though the lots were acquired in separate transactions and assessed separately for tax purposes, where the combined acreage of the lots did not exceed the acreage limitation).

[126] On this point, this case is distinguishable from the cases relied upon by the Debtor. In each of those cases, the State of Florida was a participant in the proceedings. For that matter, in each of those cases, a private landowner was attempting to vindicate his ownership of a water body. *See, e.g.*, *Adams v. Crews*, 105 So. 2d 584 (Fla. Dist. Ct. App. 1958). Here, Mr. Cole is attempting the reverse.

[127] *See Kellogg*, 197 F.3d at 1121; *Englander*, 95 F.3d. at 1032; *In re Baxt*, 188 B.R. at 324–25.

[128] *In re Quraeshi*, 289 B.R. at 244.

[129] *Id.*

[130] *In re Wierschem*, 152 B.R. 345, 347 (Bankr. M.D. Fla. 1993); *see Englander*, 95 F.3d at 1031.

[131] *Cf.* Ala. Code § 6-10-2 (limiting homestead exemption to $15,000 in value); Cal. Civ. Proc. § 704.730 (limiting homestead exemption to $75,000–$175,000 in value depending on status of residents); Mo. Rev. Stat. § 513.475 (limiting homestead exemption to $15,000 in value); N.Y. C.P.L.R. 5206 (limiting homestead exemption to $75,000–$150,000 in value depending on county of residence); Ohio Rev. Code § 2329.66(a)(1)(b) (limiting homestead exemption to $125,000 in value); S.D. Codified Laws § 43-45-3 (limiting homestead exemption to $60,000 in value if property is sold either voluntarily or involuntarily); Vt. Stat. tit. 27 § 101 (limiting homestead exemption to $125,000 in value).

[132] 152 B.R. 345; *see also In re Radtke*, 344 B.R. 690 (Bankr. S.D. Fla. 2006) (concluding that apportionment of the sale proceeds must account for mixed residential and commercial use of the property); *In re Pietrunti*, 207 B.R. 18 (Bankr. M.D. Fla. 1997) (concluding that debtors were entitled to claim as homestead 1.25 acres of a total 5 acres where debtors resided only in 1 of 4 residences located on the parcel).

[133] *In re Wierschem*, 152 B.R. at 346.

[134] *Id.* at 349 ("[T]he debtors shall be entitled to the portion of the net proceeds that the square footage of the debtors' residential unit bears to the total square footage of the two structures.").

[135] *See Kellogg,* 197 F.3d at 1120.

[136] *In re Wierschem*, 152 B.R. at 349 (citing *Hillsborough Inv. Co. v. Wilcox*, 152 Fla. 889, 891 (1943)).

[137] *Williams*, 427 B.R. at 544 (quoting *Snyder v. Davis*, 699 So. 2d 999, 1002 (Fla. 1997))

[138] *See generally Smith v. Guckenheimer*, 42 Fla. 1, 36–42 and 38 (1900) ("The creditor has a legal right to sell any property of his debtor not exempt from execution. The constitution declares that the exemption shall not apply to excessive improvements. This is a constitutional command, as forceful and mandatory as the other command to exempt the homestead.").

[139] *Englander*, 95 F.3d at 1032.

[140] *O'Brien*, 705 F.2d at 1003–04.